Case number 23-2691 from the District of Eastern Missouri, Jennifer Harmon v. Second Judicial Circuit of the State of Missouri, et al. Ms. Woodworth, take your time, and when you're prepared, please proceed. Good morning, Your Honors. I'm Sophie Woodworth, and I represent the plaintiff in the underlying case, Jennifer Harmon. We're here to talk about the tragic death of her son, N.J., and how he was treated by the appellees in their care. That includes the Second Judicial Circuit and numerous individual defendants employed by the circuit and other facilities that took care of N.J. In the order of the district court that we're here to talk about today, the court basically called the individual defendants government defendants. So if I refer to them as government defendants or individual defendants, I'm talking about all of those listed in our petition. And I know that Your Honors have our briefs and our arguments, and so I don't want to completely reiterate those. But I know you also know that our claims are for Section 1983 violations for the deprivation of due process and substantive rights of N.J. in his protection while in the care and custody of the defendants. We also have state law claims, as you know, for negligence and wrongful death. We filed this case, listed all these defendants, and immediately a motion to dismiss was filed by all the parties, by all the defendants. And the district court, as you know, on March 31st, 22, decided that the Second Judicial Circuit is not a person under Section 1983. And we object to that. We believe that under Monell, the Second Circuit is indeed a person because, as Monell says, municipalities and counties are persons. It is our position that the Second Circuit is indeed a municipality, or at least the— What policy, then, did you allege was at issue and violated? I apologize, Your Honor. I'm sorry, what were your— What policy, then, of the district did you allege was faulty and the cause of the injuries? With respect to deprivation of his due process rights and, in addition, that they created a dangerous condition on their own property. Monell liability goes and requires that you cite some governmental authority's regulation or policy that was at fault and not necessarily the specific conduct of individuals. Right, I understand. And I appreciate that, Your Honor. I believe it's in my brief, and I wish I could point to that at the moment. If given the opportunity, I'll look at that and report back. Let's step back for a moment on the claim that somehow the Second Judicial Circuit is the legal equivalent of a political subdivision. I understood the Circuit Courts of Missouri to have their, you know, sort of way back in the original midst of time that they were created in the 1820 Constitution, and that they're a constitutional jurisprudential district, not a political subdivision. They have no independent authority to tax. They have no independent authority to legislate. They have no independent authority to operate under home rule or under any kind of home charter. They are, in fact, a wing of the sovereign state of Missouri to dispose of and adjudicate judicial questions. Now, that sounds an awful lot like a court and not a public subdivision. It sounds a lot like something that would ordinarily be bathed and clothed in the firmest type of absolute immunity that we give to courts. So why am I wrong in thinking that? And I think, Your Honor, I understand what you're saying. I think the problem in this case is that the case was dismissed early on before we had an opportunity to conduct discovery. There was discussion in the case about the facility where N.J. was housed and in custody, and that that facility is owned by the county of Adair County and is part of that system. And so it was the family court that put N.J. in that facility. And so I think this is part of our argument. But the facility is separate from the court, right? Right. And see, I'm not sure procedurally how you'd just sue the court. I mean, courts are generally absolutely immune, right? Right. And so why isn't the lawsuit directed at Adair County for their management of the facility? In hindsight, I do believe Adair County probably should have been in the case, Your Honor. I agree with that. I think this is the purpose of our inquiry with respect to the motions to dismiss and why we felt as though there needed to be additional facts listed with respect to a basis for that affirmative defense for the motion to dismiss filed by the defendants. I have, obviously our briefs contain an enormous amount of research and briefing with respect to the Second Circuit and its position in this case. I'd like to move just for a moment to the qualified immunity and official immunity of the individual defendants. If I could, with respect to qualified immunity, as you know, the conduct of the individuals in this case is what's at issue. And it's our position that their conduct in this case was particularly shocking. They were aware of a substantial risk of harm to NJ, and by their deliberate indifference to those risks, they created a condition that led to NJ's death. One thing I found that I didn't see much of in your brief, if at all, was the clearly established law requirement, which is cases that were similar or established a firm principle that these defendants failed to follow. Do you have any cases or any authority of cases that look like this or establish some sort of clearly established principle? With respect to qualified immunity, we'll stand on what's in our brief, Your Honor. With respect to official immunity, I've got a particular case I want to talk about with you. But nothing on qualified immunity? Because you were talking about that, and I was worried that I was missing something, because I didn't see anything specific in the brief other than just sort of these general principles you've laid out. Right, and we've listed the DeShaney case, which I would draw your attention to, which talks about the special relationship that creates the duty for the qualified immunity argument, creates the duty in these individual defendants to protect NJ because he was in their custody. They knew he was a danger. They knew he was suicidal. They provided him the tool to commit his own suicide. And so we rely on DeShaney, and we also rely on the Youngberg case, I believe we cited, Your Honor, which talks about the duty as well with respect to anybody who is institutionalized in the state of Missouri. I was a little surprised that you never – I think the seminal case that we've got is Gregoire, which basically starts off by basically saying that there's – I've got to pull it up here to actually figure it out, but deliberate indifference can lie when you're aware of a medical need, including the risk of suicide. So if somebody – I think the direct quote was that if somebody called the sheriff and said, defendant is at risk of suicide, it may well be deliberate indifference to ignore the call, right? And I think that that case is out there. And there have been cases that we've talked about suicide risk since then. And so I thought that the qualified immunity piece was not really fleshed out like it could have been. But you're right to focus on the nature of this relationship, because a special relationship arises out of the nature of a person who is committed for a mental health problem as opposed to someone who is incarcerated. And it arises out of the relationship that exists, which is a guardian ward relationship between the government and the state. And so we have this different test for that. Why do you – and really, you say it's shocking, and all I know is that the fifth prong of that test is must shock the conscience. And it takes a lot to shock the conscience of a court, right? I mean, as a general principle, that's a pretty high standard. Can you give me your best argument about what was so shocking about this? What was so shocking, Your Honor, is that this is a troubled young man. He is suicidal before he ever comes to the facility, the BNJJC. He is troubled. He is suicidal. They all know he is suicidal. Upon admission at the BNJJC, they are told, and they have the records, about his suicidal ideations. They know this. They allow him, despite this knowledge, to retain a cloth belt that was in his possession when he arrived. They allowed him to have that belt, clearly knowing that some folks with suicidal ideations use a belt to commit suicide. They allowed him to do that. They did not check him every 15 minutes as they were supposed to do. Judge Pitlick found that they did check. Judge Pitlick found that looking through the peephole at 15 minutes and then following up at 22 minutes was, in fact, a 15-minute check. Your argument is that they needed to open the door and they needed to look in and they needed to check on the general welfare, right?  If Your Honors were to take a look at the Letterman case, which does discuss more the official immunity, but it still talks about the idea about these close observation checks. It was a very factually similar case in that it was not a child juvenile center. It wasn't that, but it was a medical part of a correction center. Counsel, it's curious in this case. The record seems to verify an officer or someone, their guard or employee, looking into the peephole at the intervals that Judge Erickson mentions, but is there anything to indicate what that person saw or was there any record of what they observed looking through? No, Your Honor, and I appreciate the question because I think that would be fleshed out in discovery in this case, right? I stayed in a hotel room last night to have this argument today. It has a peephole in that room, and I looked through that peephole. What can one see through a peephole that tells you about the safety of the patient in the room or the occupant in the room? Either way, either way, in or out, right? And all we have, all we have is videotape that appears as though the nurse looks at the door. It doesn't even, I mean, we can't confirm that it's the peephole, but we believe she's looking through the peephole. So, yes, that is what's worked out. Well within your rebuttal time now, you can continue if you like or preserve it. Could I just ask really quickly on the peephole question? Does the video show how big the peephole is or no? Is that one of these little small ones or is it, you know, because I've seen them that are like this large. I appreciate the question so much, Your Honor. No, it appears to be a very, very small, like the one I saw in my hotel room last night, which was very small. So it was not a window of any type, and it had that obstructive look about it. So that's the best we've got from the video. With respect, real quick, I know my time is short, but I do want to get out this discussion about the official immunity. With respect to the Letterman case, that case was permitted to go forward, and it went forward all the way through a trial. And official immunity was something that the trial court there was interested in, but decided not to make a determination about it until trial, and then still decided at trial that the defense was denied. And following the verdict, this court said that the 15-minute observation requirement, quote, confers no policymaking authority and requires no professional judgment. And as a result, the close observation policy is ministerial, and the defendant is not entitled to official immunity. So I think it's really important to point out the Letterman case, because factually, strikingly similar. Legally, very similar, and right on point, we believe. And I will reserve what little time I have left for rebuttal. Thank you. Thank you, Ms. Woodworth. Mr. Morello. May it please the Court. I'd first like to begin with the 11th Amendment immunity and the Second Judicial Circuit. We're going to rely on precedent here. This is nothing new in the Harris v. Missouri Court of Appeals case in 1986. It established it, and not only that, it dispelled with this Monell argument. It goes further to say that the courts are not these political subdivisions under Monell. And this has been reaffirmed, this position that the courts are entitled to 11th Amendment immunity, as recent as 2019 Wright v. McGill. And to their other argument, I don't think that any argument under 537-600 Constitution express waiver, 11th Amendment immunity, at least one that this Court can make from the statute. Can we talk about the special relationship theory and just walk through the test? If you look at what's got to be plausibly alleged, you start, there's got to be a member of a limited or precisely definable group. Well, it's a kid who's been committed for mental health issues, and so I think that's a definable group. The state conduct have to put him at some significant risk of serious, immediate, and proximate harm. The way they pled this, and we have to assume that this is true at this stage of the proceedings, and that is that they observed him with the same belt that he used to hang himself, trying to cause harm to himself by using it as a tourniquet. And we also know that he was taken into custody as an at-risk child because he was at high risk of suicide, right? So that seems to be that they have some, no one. Then we have those third-pronged overlaps. It says the risk is obvious and known to the state officials, and officials are alleged to have seen him use this belt to harm himself. And then the allegation is that they acted recklessly in conscious disregard of that known risk. The fifth one is that the conduct shocks the conscience. And this is at the motion to dismiss stage. There's no discovery, and the argument is being advanced that we at least have the right to flesh out the circumstances and that there's enough pled to get there, at least at the discovery stage. Why are they wrong? Well, they're wrong for a couple reasons, and I'll set this aside and come back to it. But first, on the order, page 13, the district court talks about the clearly established prong. I don't think a full analysis of the facts for the constitutional issue was done. And the courts are allowed to do that and find for either prong, and that there's no sufficient case law, which is plaintiff's burden, of course, that are sufficiently analogous under the test. But I'll come back to that. For the constitutional state-created danger, one of the first problems is that this conduct needs to be particularized per defendant. This generalized conduct, I don't think, is enough. And second of all, I think the court mentioned this earlier, but if I were to argue it, I don't think it shocks the conscience. I think what we have here, while tragic, these are facts that go to negligence, which simply isn't enough under these 1983 deliberate indifference standards. And Judge Erickson, I believe you mentioned the Gregoire case, which is a risk of suicide case. But I believe the distinction I would make is that, although not cited by, I think, either party, this would be an Eighth Amendment standard type case, whereas here we have this substantial due process issue under 1983. And that leads to the clearly established issue. The district court found, and I would obviously agree, that none of the cases cited are sufficiently analogous. The standard for the clearly established prong is under Graham v. Barnett, but as recently decided in Martin v. Turner in 2023, the plaintiff is required to point to existing circuit precedent. Now, it doesn't have to be this perfectly analogous throughout case. However, it needs the sufficiently similar facts to govern the officer's conduct. So, first of all, we don't really have analysis that governs each individualized officer's conduct. It's just generalized analysis. But the dispositive question is whether the violative nature of the particular conduct is clearly established. And it has to be undertaken in light of specific context in the case, and as the court noted, not as a broad proposition. So each of these cases that plaintiff cites, not one, although they do touch on substantive due process, not one talks about any sort of risk of suicide, nor do the facts properly align that would sufficiently give notice of any of these defendants that they would be violating any of NJ's constitutional rights. And going back to some of the, there are some supervisory allegations. And although there weren't, this wasn't really analyzed at the district court, I would note that the amended pleading doesn't really adequately plead a notice of pattern that is sufficient to even maintain a claim. And under these sort of either, whether under a Monell theory or a failure to train supervised theory, there needs to be an adequate sufficiently similar notice of these pattern of unconstitutional violations. And none of that is pleaded here. So even if the court didn't rely on clearly established, they could have relied on that principle as well. But I'd like to turn to official immunity now. A couple points. Would you address the Letterman case? Yes, Your Honor. I'll address that first. So the Letterman case was, I believe, decided in 2017. And the law in Missouri has changed since then. And that case was decided under a different standard. So as a threshold measure, the district court found that the plaintiff failed to meet the burden to plead a statute or regulation. This is at page 15 of the order. And the plaintiff cites, hey, this is an affirmative defense and attempts to shift the burden to the defendants here. Well, in Missouri law, that's not necessarily true. Yes, it is an affirmative defense. However, for pleading a narrow exception to official immunity, a plaintiff must plead facts establishing exception to official immunity. And that wasn't really done so here. That's the State Ex Rel Morales v. Alessi case, 679 Southwest 3rd, 467, Pennsite 471. It's not in the brief, but it's a newer case that stands for the position that was cited, that essentially they have to plead this narrow exception. And here it isn't a narrow exception. And that Letterman case talks about administrative serial duty and talks about discretion, and whether it's policymaking and other factors. This is not the standard in Missouri anymore. The central question is whether there's any room whatsoever for variation. And it doesn't analyze the exact facts of the case. It analyzes the nature of the duty. So in this case, I believe we're talking about these 15-minute checks. And these 15-minute checks is a narrow pleading standard. There's nothing in this policy that talks about, well, how are they to conduct these checks? Is looking through the window sufficient? And that is enough variation for the state courts to find that there is variation in discretion that makes it not a ministerial duty under law. And the test here, and it's been set out in ALSEP and the Morales v. Alessi case I just cited. But not only is the test any discretion whatsoever, but the test is a writ of mandamus. So the question would become, alternatively, can the court issue a writ of mandamus to check these, make these suicide checks in a certain way? And I think the answer is no. But we can go back to that central question. Why doesn't Letterman apply? Because Letterman factually has some similarities here, where you have an inmate on suicide watch in a condition where 15-minute interval observation is required. And it's deemed not to be merely ministerial. Or it was deemed to be ministerial in nature and not discretionary. I believe Letterman doesn't apply because it applies the old standard for what is a ministerial duty. And the court has reaffirmed, and the Supreme Court of Missouri has reaffirmed in multiple cases after the Letterman case that it is now a more stringent standard. Technically, it's a reaffirmation of a very old standard. That's the position the state takes. But nonetheless, it's a very narrow standard. It's any room for discretion whatsoever. So in Letterman, I believe it would be decided differently today based on the facts of that case. So the essential argument is that the mere existence of the possibility that one could look through the window or one could open the door, that that is sufficient discretion to turn it into a non-ministerial act under all circumstances? Yes, Your Honor. And I believe there's a recent case that's sufficiently analogous. It's the State Exera Love v. Cunningham case. 689 Southwest 3rd 489. Now this is a pleading, a motion to dismiss case at the Supreme Court of Missouri that dealt mostly with the malice issue. However, it did talk about issues of ministerial duty and there are multiple cases that talk about policy and how things are done. And I believe this case talks about... Was that case in your brief? No, Your Honor. I didn't write the brief. Would you supply the court with a supplementation of your briefing under Rule 28J citing to the case authority that you're referencing now? Yes, Your Honor. And I'll provide those slides. But I believe that this more narrow discussion that the Missouri Supreme Court has taken over the last few years since 2019 and continues on with official immunity would make Letterman not applicable. And with this, I will see the remainder of my time unless the court has any other questions. I don't see any. And we would ask that the court affirm. Thank you. Thank you, Mr. Chaffman. Excuse me, Mr. Morello. Ms. Woodworth. Well, with my 37 seconds, I simply want to... The entire idea that this facility and these defendants had ample notice, ample warning of NJ's condition, his suicidal ideations. They provided him the means to do a suicide and he conducted a suicide. And they did not follow their own policy. Their policy did not provide for discretion. It was a ministerial act as held by Letterman. And so we ask the court to reverse the trial court's order and judgment and remand for further proceedings so that Ms. Harmon can proceed with her claims. Thank you. Thank you, Ms. Woodworth. The court appreciates both counsel's participation in argument this morning. We will continue to study the case and render decisions. The court will be in recess for 10 minutes. We will resume at 1035.